*Read, J.,
the demurrer raises two questions:
1. Does the repeal of section 24 of the act of 1824 authorize a recovery to be had upon bills or notes put in circulation by an unauthorized banking company, prior to such repeal, under the act of 1816 ?
*83 2. Will the court collaterally inquire into the forfeiture of a charter of incorporation?
The act of 1816, to prohibit the issuing and circulation of unauthorized bank paper, forbids unauthorized banking, under a penalty of $1,000; defines what shall constitute an unauthorized banking company—who shall be regarded as officers; prohibits the passing or receiving the bills or notes of such company, under a penalty; provides that the mode of recovering such penalties shall be by action of debt or indictment; declares that all bonds, bills, notes, or contracts, which shall purport to be negotiable or payable at such bank, shall be null and void; that all bonds, bills, notes, or written contracts given to such bank, or discounted by such bank, or given to any person to be discounted at such bank, or for the purpose of obtaining money, or the notes, bills, or bonds of such bank, shall be null and void. It then declares no suit shall be maintained for the use of such bank.
Section 11 then provides that every stockholder, shareholder, or partner in such bank shall be jointly and severally answerable in their individual capacity for the whole amount of the bonds, bills, notes, or contracts of such bank.
Section 12 provides that the holder of any bond, bill, note, or contract of such bank may institute suit, and recover judgment thereon, against any part or the whole of the persons who were interested in such bank at the date of such bond, bill, note, or contract, or who became interested in such bank at any time between that and the commencement of such suit.
An easy mode of pleading is there presented, and judgment on a joint suit authorized to be taken against any one or all who shall be proven to be liable under the law.
*The act of 1824, to regulate judicial proceedings where banks and bankers are parties, provides that no action shall be brought upon any notes or bills hereafter issued by any bank, banker, or bankers, and intended for circulation, or upon any note, bill, bond, or other security given and made payable to any such bank, banker, or bankers, unless such bank, banker, or bankers shall be incorporated and authorized by the laws of this state to issue such bills and notes, but that all such notos and bills, bonds, and other securities shall be holden and taken in all courts as absolutely void.
So much of this section as declares that no action shall be *84 brought upon suob bills or notes, is repealed by the act of March 23, 1840, to further amend the act of 1816.
Now the great question, in view of all these statutes, is whether section 24 of the act of 1824 renders the notes and bills, issued by unauthorized bankers, void, or only suspends the remedy under the act of 1816. Because if they are void, the repeal of that portion of.section 23 of the act of 1824, which forbids any action to be brought upon them, will not revive them so as to permit a recovery to be had under the act of 1816. The legislature has no power to set up a void contract and make it valid; to create a right, when none existed, by the act of the parties. An act which created no right and imposed no obligations as between parties, at the time that it was performed, can not be converted by any subsequent legislative authority into a legal right of binding obligation.
The act of 1824 did not repeal the act of 1816, it only suspended its action. If it had repealed it, the repeal of the repealing act would not have revived it. It is not pretended but that sections 11 and 12 of the act of 1816 are in full force since the repeal of that portion of section 23 of the act of 1824, which suspended their action. Section 12 of the act of 1816 authorized suits to be sustained in cases where otherwise they could not have been maintained, as being in violation of the policy of the law. Under the act of 1816, suits could be maintained *upon the notes and bills of unauthorized bankers. Section 23 of the act of 1824 declared that the courts should no longer entertain such suit. Section 11 of the act of 1816, which fixed the liability of illegal bankers upon their bills and notes, remained unaffected. But section 23 of the act of 1824 forbid the courts to entertain any suit or action upon such liability. Then, after the passage of the act of 1824, there was a liability without a right of action to enforce it. The remedy was denied—it has been restored by a repeal of the act of denying it. This is, then, a mere case of suspended remedy, and the legislature has the full power to restore it.
But it is argued that these notes and bills are void. They aro not declared void by the act of 1816, but are expressly declared to be valid against the illegal bankers. But it is said the act of 1824 declares them to be void. It is not so. Section 23 of the act of 1824 is a mere prohibition to tho courts. It forbids any *85 action to be brought upon such notes or bills, and declares such notes and bills shall be taken in all courts as absolutely void. It does not declare that such bills and notes are void, but that in an action brought upon them, they shall be held to be void by the court. That is, they shall not support tbe action. It does not declare them void generally and absolutely, but that they shall be held and taken as void in court. If the legislature had intended to declare them wholly void, they would have used more apt words, and not employed words which express a mere denial of tbe remedy. In the act of 1816, where the legislature intended to declare contracts, given to illegal bankers, void, they employed a different sort of language, such as the following : such notes and bills ■‘are hereby declared null and void”—“shall be, and are hereby) declared null and void.” But in section 24 of the act of 1824, it is declared that no action shall be brought, and if action is brought, the courts shall hold the evidence to support it absolutely void, for any such purpose. This is the true meaning of the legislature, as gathered from the words *of the act, and comparing the words of this act with the words of other acts upon the same subject matter, when the design was to declare certain notes and bills void.
The whole scope, too, of the act of 1824, was to regulate the proceedings of courts; and section 23 is simply directory to the courts, instructing them as to what they shall do and what they shall not do,—in fact merely denying them jurisdiction in eases of this sort.
But it may be said, the legislature would have no reason for merely denying the remedy.
Det us look at the object had in view by all these laws. It was to prevent the circulation of unauthorized bank paper. To accomplish this, penalties were imposed upon the bankers themselves, and upon those who should knowingly receive and pass their paper. All contracts and securities given to the unauthorized banking companies were declared null and void. While thus the illegal bankers were punished, and all acts of theirs were declared void, they still were declared liable, jointly and severally, upon all their notes and bills to the holders, and an easy mode was provided for prosecution. Thus it was attempted, not only to restrain illegal banking by penalties, but to cut off all temptation to bank illegally, by declaring all contracts to them void, and on- *86 forcing all against them. Tbo circulation of this illegal currency was also prohibited by penalty on any persons knowingly receiving and passing it. But finding that all this would not accomplish the end, it was provided that the holders of such paper should not be permitted to maintain suit upon it. It was not designed by section 23 of the act of 1824 to aid or protect the illegal banker, but merely to put another check upon illegal hanking. To legislature may, and undoubtedly did, in this last experiment, deem it prudent and right to test the policy of the law, and hold in their own hands the power to remedy any great or unforeseen mischief which might arise by refusing to permit suits to be maintained upon such paper. And, therefore, instead of putting it beyond their power to remedy *such mischief, if any should arise, the remedy was denied only, that it might be restored, if the public good should require it. But the illegal bankers come into court, and ask the statute to be construed as though its object had been solely for their benefit; when, in point of fact, it was designed to check their operations, and to prevent them getting a circulation by alarming the people, and refusing a remedy upon such paper. The legislature took this evident distinction between the masses of the people, who might be imposed upon by a fraudulent currency, and the crafty banker. In the one instance, it was the evident intention to create distrust in the public mind, to check the circulation of such paper; but still, so far as the public was concerned, the innocent holders of such paper, to retain the power, if it was deemed expedient, to furnish relief; but so far as the banker was concerned, to cut him down at once, by declaring that all contracts with him, in carrying on his illegal operations, were wholly void. Thus, in the one instance, the remedy was denied only, which might be restored; in the other, all was declared void, so that no relief ever could be given, for none was ever designed or intended, under any circumstances. But after a trial of the policy of section 23 of the act of 1824 for sixteen years, it was found that it did not cheek illegal banking. But banking was found so profitable, especially if the banks, or persons issuing their paper, were not bound to redeem it, that cupidity and avarice at once seized upon this mode of acquisition; dead charters were galvanized into life, and existing ones perverted. Library associations, intended to issue knowledge, issued paper money. Towns, corporations, railroad companies, and illegal as *87 sociations of all sorts, at home and abroad, were pouring out their paper upon the community. The authorized banks had, by mutual consent, suspended specie payments; so that all paper money appeared to be alike good. Under these circumstances, all law for the restraint of legal and illegal banking was put at defiance, and the whole country flooded with illegal bank paper. If no -tremedy could be furnished, the people would have been plundered of millions, to enrich men who had acted in violation of law, and many from fraudulent motives. To have protected such men in their ill-gotten wealth, by section 23 of the act of 1824, would have been a species of legalized robbery. The legislature, therefore, repealed that clause of the act, which forbid suits to be brought by the holders of such paper. And the result has made manifest the wisdom of the legislature, in having only denied the remedy, and having held the power of relief under legislative control.
Thus, if wo look to the provisions of the act intended to prevent unauthorized banking, and the nature of the evil intended to bo remedied, we can see good reason why the legislature should have taken this distinction between the unauthorized banker and the community. The object was protection to the community, by the prevention of unauthorized banking, by punishing and depriving those engaged in it, of all power to acquire legal rights by such business.
It was well known to all familiar with the nature and history of a paper money circulation, how liable it is to abuse, and that the most cautious and stringent legislation has not been found able to restrain it within safe limits, or to check its evils ; so much so, that the idea is becoming quite general, that the only mode of guarding against its mischief, is to banish it altogether. It is well known, too, that in times of what are termed high confidence, and in times, too, when the authorized banks have failed to preserve their credit, and refused to redeem their paper, that the circulatiop is almost certain to become expanded beyond all reasonable limits. That unauthorized bankers are enabled, under these circumstances, to get into circulation millions of their paper, without the community being much in fault. Now, it was not the design of the legislature to invite and stimulate these frauds, by giving perfect impunity, by a surrender of all legislative power to remedy the mischief, and give relief to the holders of such paper; *88 but, to make it *tho interest of the community to sustain 'the policy of the law, they withheld the remedy upon such bills or notes, but did not destroy the contract. In restoring this remedy, there has been no violation of constitutional right, or an improper assumption of legislative power, and certainly not of any principle of justice or moral obligation. But every man admits, that it is in accordance with justice, that those men who have put into circulation their notes and bills should be compelled to comply with their contracts. To do otherwise is a perpetration of a most gross fraud. Men of any elevation of sentiment or sense of justice would comply with the moral obligation of performing their contracts, although not enforced by legal sanction. Men of true tone and temper never evade their moral obligations, by skulking behind a legal protection. Hence wo find no objection to permitting a recovery upon these bills and notes.
I might cite 4 Serg. & Rawle, 356, and 17 Ib. 64, as authorities to support the conclusion; but I am not disposed to give to those cases the sanction of precedent, as they support a law which makes a contract, wholly void at the time of its being made, of valid obligation by subsequent legislation. This is beyond the limits of just legislation, and in violation of fundamental principles and constitutional rights.
As to the second count. This is defective. It assumes that the company acted under a charter, which had not expired at the time of the issuing of the bills upon which recovery is sought, but had become forfeited by non-user and misuser. This would be calling up the question of a forfeiture in a collateral way. But it has been urged in argument that the charter has been repealed. This would not alter the rights which existed before such repeal. The repeal of a charter is not a seizure of the property of the company to the state, nor does it impair any rights previously acquired. For example, the repeal of a charter of a road company does not give the road to the public; but converts it into the private property of the individuals composing the company, *to use as they see proper, without public control. If the state should seize it to public use, the constitution requires that full compensation should be made in money. Hence, the plaintiffs in this suit acquire no new rights against the defendants by the repeal of their charter.
The remaining are the common counts.
*89 The demurrer is sustained as to the second count, and overruled as to the first. The defendants will have leave to plead if they wish it.